# IN THE COURT OF APPEALS OF IOWA

No. 18-0419
Filed December 19, 2018

IN RE THE MARRIAGE OF CAROL ANNE NEILS
AND THOMAS LEE NEILS

Upon the Petition of
CAROL ANNE NEILS,
        Petitioner-Appellee,

And Concerning
THOMAS LEE NEILS,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


        Thomas Neils challenges the economic, child support, and visitation

provisions of the decree dissolving his marriage to Carol Neils.  **AFFIRMED.**


        Jaclyn M. Zimmerman of Miller, Zimmerman & Evans, P.L.C.,Des Moines,

and Aaron W. Lindebak of Grefe & Sidney, P.L.C., Des Moines, for appellant.

        Danni J. Harris of Hope Law Firm, PLC, West Des Moines, for appellee.



        Considered by Danilson, C.J., and Potterfield and Doyle, JJ.

**DOYLE, Judge.**

Thomas Neils challenges the economic, child support, and visitation provisions of the decree entered dissolving his marriage to Carol Neils. Upon our de novo review, we affirm.

### I.  Scope and Standards of Review.

We review dissolution of marriage cases, including issues concerning economic provisions as well as child custody and visitation provisions, de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018); *Callender v. Skiles*, 623 N.W.2d 852, 854 (Iowa 2001). We decide anew the issues raised, but give weight to the district court's factual findings, especially with respect to the credibility of the witnesses, since "the district court was able to listen to and observe the parties and witnesses." *See In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015); *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010).

### II.  Background Facts and Proceedings.

Thomas and Carol married in 1998. They have two children; their youngest was born in 2001.[1] At the end of 2016, Carol filed a petition seeking dissolution of the parties' marriage. Trial on the matter was held in September 2017.

The district court awarded the parties joint legal custody of their minor child and placed that child in Carol's care, with Thomas having visitation. The district court ordered the parties to work out a visitation schedule guided by the child's best interests. For purposes of calculating child support, the court determined

---

[1] The parties' eldest child was an adult by the time of trial.

Thomas's earning capacity was $50,000 and imputed that amount to him as his income. In dividing marital assets, the court generally awarded to each party property held in that party's individual name; Carol was awarded 100% of her retirement accounts, and Thomas was awarded 100% of his retirement accounts. The court likewise divided marital debts. The court awarded Carol the marital residence, and before dividing the value of the property between the parties, the court determined Thomas was entitled to an offset of $123,000 for his initial down payment for their residence. Ultimately, the district court directed Carol to pay to Thomas $187,500 as a property-settlement-equalization payment.

Thomas now appeals. Other background facts will be discussed as necessary below.

### III. Discussion.

Thomas argues the court erred in calculating his child-support obligation. He also asserts the court should have set a visitation schedule, and, in not doing so, the court essentially set his visitation at Carol's discretion. Finally, Thomas contends the district court's property distribution was inequitable, and he maintains awarding him one-half of Carol's retirement accounts would achieve equity between the parties.

### A. Child Support and Thomas's Income.

"In Iowa, child support is calculated using the child support guidelines." *In re Marriage of Erpelding*, 917 N.W.2d 235, 245 (Iowa 2018); *see also* Iowa Code § 598.21B(1) (2016); Iowa Ct. R. 9.2. "The purpose of the guidelines is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective

incomes." Iowa Ct. R. 9.3(1). "To compute the guideline amount of child support," the district court must first compute the adjusted net monthly income of each parent. Iowa Ct. R. 9.14. That amount is ascertained by first determining each parent's gross monthly income. *See* Iowa Ct. R. 9.14(1).

Under the guidelines, "'gross monthly income' means reasonably expected income from all sources." Iowa Ct. R. 9.5(1). However, "the court shall not impute income" to a party "except . . . [p]ursuant to agreement of the parties, or . . . [u]pon request of a party, and a written determination is made by the court under rule 9.11." Iowa Ct. R. 9.5(1)(d)(1), (2). Rule 9.11(4) permits the court to

> impute income in appropriate cases subject to the requirements of rule 9.5. If the court finds that a parent is voluntarily unemployed or underemployed without just cause, child support may be calculated based on a determination of earning capacity. A determination of earning capacity may be made by determining employment potential and probable earnings level based on work history, occupational qualifications, prevailing job opportunities, earnings levels in the community, and other relevant factors. The court shall not use earning capacity rather than actual earnings or otherwise impute income unless *a written determination is made that, if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the child(ren) or to do justice between the parties.*

(Emphasis added); *see also In re Marriage of McKenzie*, 709 N.W.2d 528, 533 (Iowa 2006).

On appeal, Thomas points out the district court's decree did not include a written rule 9.11(4) determination to account for imputing his earning capacity instead of using his actual annual earnings of approximately $14,500. He further argues he is not voluntarily underemployed, and, alternatively, even if the court correctly concluded he was so underemployed, $50,000 far exceeds his actual

earning capacity. He requests his support obligation be recalculated using his actual earnings.

It is true the district court did not make any written determinations in its decree expressly stating "that, if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the [child] or to do justice between the parties," as required by rule 9.11(4). Nevertheless, on our de novo review, the record supports the findings that Thomas's earning capacity is in the range of $50,000 annually, that Thomas is voluntarily underemployed, and that adjustments would be necessary to provide for the children and do justice between the parties if actual earnings were used to calculate Thomas's child support obligation.

### 1. Earning Capacity.

Thomas has a bachelor's degree with majors in computer science and finance. He worked full-time in the field of information technology (IT) until he stopped working altogether about nine years prior to the trial. His full-time earnings fluctuated; for example, he earned about $63,000 in 2002 but nothing in 2003. In 2004, he earned approximately $54,000 but only about $5000 in 2005. In 2007, he earned $18,496 but only $2880 in 2008. He stopped working in 2009, and he was not gainfully employed again until early 2017 when he started working in a grocery store's kitchen approximately twenty-eight hours per week at ten dollars per hour. Despite his underemployment, Thomas was able to pay off both marital homes' mortgages, testifying he merely "made extra payments on the principal." The court found his testimony "regarding how he was able to pay the mortgages off for both marital homes in such a short time based upon the income of the parties

during that time period" to be evasive. The court further noted "throughout most of the marriage it appears that Thomas has kept private many aspects of his finances, accounts, and investments."

## 2. *Voluntary Underemployment*.

Additionally, the court clearly did not find credible Thomas's testimony that he and Carol agreed Thomas would become a stay-at-home-dad when his employment ended in 2009. The court found

> For over nine years Thomas decided not to work at all and to be what he termed as a stay-at-home parent. Thomas was a stay-at-home parent in name only as many of the responsibilities of a parent fell to Carol nevertheless. During the time in which Thomas was unemployed, although he did attend practices and activities of the children in regard to sports, the time that Thomas spent with the children was no greater than that spent by Carol with them also. In fact, for a stay-at-home parent Thomas appeared to have a lot of time for himself. The children were often put in daycare even though Thomas was at home. Thomas was able to exercise regularly at the YMCA and not be present at most family dinners prepared by Carol. Indeed, Carol continued to do most of the parent and family duties including cooking, cleaning, attending the children's school conferences and sports activities, taking the children to their medical and dental appointments, and otherwise being more involved with the day-to-day parental and family needs and responsibilities for the family and specifically for the children. Carol was also the main income earner for a significant amount of time while Thomas remained unemployed by his own volition. Other than the complaint made by Thomas concerning his back, there appears to be no reason whatsoever why Thomas could not continue at the job he previously had in IT or to find further employment in that specific career area. Thomas's recent attempts at obtaining employment in March and April of 2017 and ending up with a part-time job at a Hy-Vee store is a halfhearted attempt to reenter the job market. The requested spousal support by Thomas indicates that he would continue either to work minimal hours or not to work at all. Thomas is quite capable of upgrading and bringing up to date his skills in the IT area. In fact, he attempted to do so by entering classes at Des Moines Area Community College. There is no reason why Thomas could not earn the income he earned prior to removing himself from the work force.

Upon our de novo review of the record, we wholeheartedly agree with the district court's assessment. Generally speaking, there is no question that being a stay-at-home parent is in and of itself a demanding full-time job, and we do not diminish such a role's difficulty and importance to a family. But here, as the district court found, the record shows the title as used by Thomas was in name only. By the time of trial, Thomas essentially lived as a roommate that looked after himself, assisted with an occasional bill, and, at times, supervised the parties' children. Carol basically did it all, though not by choice.

**3. Adjustments Needed to Provide for the Children and Do Justice Between the Parties.**

We believe the district court's factual findings and conclusions balancing the parties' abilities and actions is a minimally sufficient written finding that imputing Thomas's income is necessary to do justice between the parties. *See, e.g.*, *In re Marriage of LeGrand*, No. 13-0662, 2014 WL 1056696, at *5 (Iowa Ct. App. Mar. 12, 2014) ("We disagree that the district court's findings give rise to the inference that substantial injustice would occur. We do find, however, that the court's balancing of Allan's ability to work full time and Connie's long-term employment history with Nagle, coupled with her continuing and future care of the children, is a minimally sufficient written finding that imputing Allan's income is necessary to do justice between the parties."). Here the district court found there were financial strains on the household when Carol tried to meet the children's needs with her income alone. The court found:

> In fact, the failure of Thomas to work either full time or part time caused considerable financial strain upon the family. This financial strain was not taken seriously by Thomas. Carol would at

times request financial help from Thomas for the family. Thomas denied that Carol would request money for family expenses. At times expenses and finances were stressed to the point that Carol would either give blood or borrow money from one of the children.

For the reasons stated above, we do find (1) Thomas's employment potential, his past earnings, and other relevant factors support the determination that he has an earning capacity of at least $50,000 annually, (2) Thomas is voluntarily underemployed, and (3) if Thomas's actual earnings rather than his earning capacity were used in determining his child support obligation, adjustments would be necessary to provide for the children and do justice between the parties.[2]

Because deviation from the guidelines was appropriate under the facts of this case, we find no error in the district court's ultimate child-support-obligation determination. We therefore affirm on this issue.

## B. Visitation.

Thomas also requests a visitation and holiday schedule be set, arguing the court's failure to set a schedule essentially gave all the power to Carol, and as such, Carol could "decide not to mutually agree with any proposal Thomas makes, and lawfully deprive the children of time with their father." Thomas cites an unpublished case from a panel of this court remanding a visitation issue back to the district court to set a schedule. See Thompson v. Fowler, 17-0284, 2017 WL 6513973, at *3 (Iowa Ct. App. Dec. 20, 2017). That case is distinguishable. In Thompson, the district court's ruling had placed visitation with the parties' child in one parent's sole discretion. See id. That is not the case here. Rather, the district

---

[2] We note the record also factually supports the alternatives stated in rule 9.11(4), that, if Thomas's actual earnings rather than his earning capacity were used in determining his child support obligation, substantial injustice would occur.

court's decree permits the parents to mutually work out a visitation and holiday schedule. There is no evidence the parties could not work together to create an accommodating schedule. Given the age of the minor child and the child's extensive extracurricular activities, permitting the parties to work together to fashion a schedule is clearly in the child's best interests.

Furthermore, we note the parties' minor child is now seventeen years old. The parties provided him with a vehicle to use and agreed to turn the vehicle over to him when he reached age eighteen. The decree provides the vehicle shall be turned over to the child once he reaches age of majority. At the time of trial, Thomas still lived in the Ankeny marital home and worked in Des Moines. There was no indication that Thomas intended to move from the Des Moines metropolitan area after the dissolution. With that in mind, there is no reason the minor child cannot drive to his father's residence anytime he wants to visit his father.

We affirm on the visitation issue.

### C. Property Distribution.

Finally, we turn to the district court's property-distribution determination. Iowa Code section 598.21(5) requires marital property be divided equitably in dissolution-of-marriage cases. *See In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). This first requires a determination of which property is subject to division, and then, considering the factors set forth in section 598.21(5), that property must be divided equitably. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007).

In determining which property is subject to division, we consider not only "property acquired during the marriage by one or both of the parties, but property

owned prior to the marriage by a party," with the understanding that, under section 598.21, "property brought into the marriage by a party is merely a factor to consider by the court, together with all other factors, in exercising its role as an architect of an equitable distribution of property at the end of the marriage." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). Ultimately, any "[p]roperty not excluded is included in the divisible estate." *Id.*

"The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts," *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009), but it "is important to remember marriage does not come with a ledger," *Fennelly*, 737 N.W.2d at 103. In determining how to equitably divide the property, an "equitable division is not necessarily an equal division." *Hansen*, 733 N.W.2d at 702. Though "it is generally recognized that equality is often most equitable," *Fennelly*, 737 N.W.2d at 102, "[e]quitable distribution depends upon the circumstances of each case," *Hansen*, 733 N.W.2d at 702. Consequently, precedent is of little value. *See McDermott*, 827 N.W.2d at 682. "[K]eeping in mind there are no hard and fast rules governing economic issues in dissolution actions," we must apply the factors contained in section 598.21(5) in reaching an equitable division. *Id.*

The district court noted "[t]he assets of both Carol and Thomas are considerable," and the court listed valuations of various bank and retirement accounts in each party's name, as well as the parties' joint bank account. The court found Carol's assets included three retirement and IRA accounts worth a total value of $727,652. Thomas's assets comprised several accounts, three of which were IRAs, altogether worth a total value of $405,966. The district court

awarded each party the accounts in his or her name without any equalization offsets. The court also awarded each party his or her vehicle, the values of which were similar, and the court directed the parties to equally divide their joint bank account.

The district court awarded Carol the marital home, valued at $252,000, as well as its furnishings and appliances. The court noted the parties disagreed upon the furnishings' approximated valuation—Carol suggested $13,000, Thomas $20,000—and ordered Carol to "pay Thomas $5,000 as property equalization payment for the home furnishings." Additionally, in a separate paragraph titled "Property Settlement Equalization," the court decreed:

> Carol shall pay to Thomas $187,500 as a property settlement equalization payment. Judgment is hereby entered against Carol in the amount of $187,500 for said property settlement equalization payment . . . . The equalization payment was arrived at by awarding Thomas the initial down payment for the marital home ($123,000) plus one-half of the remaining equity of the marital home. ($252,000-$123,000=$129,000. This sum is divided one-half each with Thomas's one-half then added to the $123,000 for a total of $187,500).

Thomas asserts the court's division was inequitable because the court awarded Carol a greater share of their marital assets. He points out Carol's retirement accounts were acquired during the marriage, and he maintains that the court should have at least divided the accounts equally. He also notes Carol has a defined benefit plan that she will receive when she retires of about $9000 annually that was not included in the property division. Thomas suggests an equitable property division would require increasing the amount of his equalization payment by about $200,000. Carol argues the amount of $187,500 awarded by the district court is equitable. We agree.

Upon our de novo review of the record, considering all of the relevant factors, we find the court's award of $187,500 was equitable under the circumstances of the case. Thomas did not work for nine years of the parties' marriage, and Carol was required to cover almost all of the parties' expenses during that time. The court found Thomas's testimony concerning his finances to be evasive, and Carol testified she did not even know about several of the accounts disclosed by Thomas despite their long relationship. All things considered, we agree with the district court that requiring Carol to pay Thomas an equalization payment of $187,500 was an equitable division of the parties' marital property. Accordingly, we affirm on the issue.

### IV. Conclusion.

Upon our de novo review, we find deviation from the child-support guidelines to use Thomas's earning capacity of $50,000 was appropriate under the facts of this case. Additionally, the court's determination the parties should create a visitation schedule together is proper under the facts of the case. Finally, the equalization payment as calculated equitably divided the parties' marital property. Accordingly, we affirm the district court's dissolution decree in all respects.

**AFFIRMED.**